Billy Joe EDGEMON *v.* STATE of Arkansas

CR 81-110                    630 S.W. 2d 26

Supreme Court of Arkansas
Opinion delivered March 15, 1982
[Rehearing denied April 19, 1982.]

*William C. McArthur,* for appellant.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee,

DARRELL HICKMAN, Justice. Billy Joe Edgemon was convicted of first degree murder of Jimmy McCormick and sentenced to life imprisonment and a $10,000.00 fine.

His chief argument is that the court erroneously admitted evidence that Edgemon was involved in a stolen car ring. The State argued that the evidence was necessary to show that Edgemon had a motive to kill McCormick. We find that the trial court was correct in admitting the evidence because the State clearly demonstrated that evidence to be an inseparable part of the case, and probative of Edgemon's motive to kill McCormick.

The State's case was circumstantial, there being no eyewitness to the killing and no admission by Edgemon. Edgemon lived alone outside Altus in Franklin County on a farm where he raised hogs. During the summer and fall of 1979 Jimmy McCormick stayed with Edgemon and helped him on the farm. At that time Edgemon was in the process of divorcing his second wife and had no relatives living with him on a regular basis.

On the evening of the 14th of January, 1980, Edgemon and McCormick drove to nearby Coal Hill in a yellow 1979 International Scout to see two women: Suzie Johnson, who was McCormick's girl friend, and a woman named Rosetta Wilson. All four returned to Edgemon's place, stayed a few hours, and then McCormick and the two women left. McCormick dropped the women off at home. Several hours later he returned to Suzie Johnson's house and said he had wrecked the Scout. He spent the night. The focus of the case is on what happened the next day, the 15th of January.

Suzie Johnson testified that Edgemon came by **her**

house three times. The first time she did not answer the door. When Edgemon returned later, she gave him the keys to the Scout and said McCormick had wrecked it. McCormick did not come to the door. Edgemon left again and returned about six or seven p.m. Johnson said McCormick told Edgemon that he had hidden the tags to the Scout in the woods. Edgemon and McCormick left together and McCormick was not seen alive again by any witness.

Robert Dale Pyron, an acquaintance of Edgemon, testified he was with Edgemon on the 15th. Pyron said he had seen a Scout like Edgemon's being towed by a wrecker that morning. He found Edgemon and they went to the wrecker yard. They saw that the Scout was Edgemon's, but they did not retrieve it. Pyron said Edgemon expressed concern about whether his keys were in the Scout and whether the tags were still on it. They went to talk to Don Holloway, who said they had better get the keys and the tags. Edgemon and Pyron went to Suzie Johnson's where Edgemon got the keys. While en route to Edgemon's place Edgemon told Pyron to throw the key to the Scout out the window, which he did. According to Pyron Edgemon made several statements about McCormick, one of which was that he thought Suzie Johnson was hiding McCormick. He also said that ". . . it would be one less burden on the world if Jimmy weren't around." At another time he said, " . . . if Jimmy came back over to his house he'd kill him." Pyron said that Edgemon told him to deny any knowledge if he was questioned by the police about the Scout.

McCormick's body was found on the 23rd of January, in a culvert on a county road. He had been killed with a shotgun blast and had been dead seven or eight days. Across the road the officers found a piece of carpet and a bloody mattress which contained pellets from a shotgun. The mattress was covered with a design of bicentennial emblems. A calendar wristwatch on McCormick was stopped between the 15th and 16th of January.

The police questioned Edgemon that day about the killing. He said McCormick had left his home on the 15th and that he had not seen him since. He denied any other

knowledge and was released. The following day Edgemon drove a 1979 Cougar XR-7, which had been in his possession, into a mining pit that was filled with water.

On the 25th of January, the police searched Edgemon's home. They found what appeared to be blood stains on a piece of carpet, coffee table, and another piece of furniture. These items were all located in front of the fireplace. Two shotguns were seized, one of which was a twelve gauge Marlin loaded with Magnum western shells, number four shot. A North Carolina license plate was also seized.

The State recovered the Cougar and proved that it and the Scout were stolen. The license on the Scout was registered to Dorothy Reynolds, Edgemon's second wife, but the tag belonged on a 1980 Lincoln Continental. The North Carolina tags found at Edgemon's house belonged on the Cougar. A deputy sheriff testified that Edgemon had told him the Scout was his. There was testimony that the Cougar had been seen regularly parked at Edgemon's.

Two witnesses testified that the mattress found near McCormick's body was just like a mattress or mattresses that had been at Edgemon's. One witness, Charles Montgomery, who had stayed at Edgemon's for a month with McCormick, said he and McCormick had each slept on such a mattress in front of the fireplace.

Edgemon told the police that the blood on the carpet piece and furniture was from a cut on his foot. An expert testified, however, that the blood on those articles was type A positive. Edgemon had type B positive blood. Another expert testified that the shot and wadding taken from McCormick's body was consistent with that contained in the shotgun shells found in one of the shotguns seized at Edgemon's.

The testimony objected to on appeal which implicated Edgemon in several car thefts came from Charles Montgomery and a North Carolina police officer. Montgomery was serving a prison sentence for theft when he testified. He testified that he stayed at Edgemon's about a month in the

summer of 1979. He said that he, McCormick, Edgemon and Edgemon's son Mark, and Don Holloway planned to set up a car theft ring. He, McCormick, and Mark, working out of Edgemon's farm, would steal the vehicles and Don Holloway would provide the titles.

He said he first met Edgemon when he sold him a stolen 1979 Scout for $400.00; it was worth $8,900.00. Next he sold him a 1979 Chevrolet Caprice stolen in Louisiana for $400.00; it was worth $8,000.00. He stole a 1979 LTD station wagon worth $7,500.00, and said he gave it to Edgemon. Montgomery said he stole a 1979 Chevrolet pick-up truck in Kansas and used a title Edgemon had for a 1979 Chevrolet truck; he took the truck to North Carolina where he unwittingly sold it to a police "sting" operation. While there, he stole the 1979 Cougar XR-7 and drove it back to Arkansas. He said he gave the Cougar to Mark Edgemon to repay a debt of $135.00. He testified that Edgemon knew all these vehicles were stolen and it was their intention to set up a "ring."

The North Carolina policeman testified that he bought the 1979 truck from Montgomery in an undercover "sting" operation and the title was in Mark Edgemon's name.

Edgemon denied that he killed McCormick or actually knew that any of the vehicles were stolen. He admitted driving the Cougar into the mining pit but he said he did so because his son had driven the car and he did not want him implicated. He would never concede that he actually owned the Scout, but said he had merely loaned Montgomery $400.00 "on it." He admitted driving it and acknowledged that the license on it belonged to one of his former wives. He said this same former wife drove off with the LTD because her car had broken down. He said someone stole the title that was found in the truck sold in the "sting" operation. According to Edgemon, Montgomery told him that he "stole" the Cougar from his own wife, and thus Edgemon did not believe it was actually stolen.

He admitted telling Pyron to throw away the key to the Scout, and said he did so only because he no longer needed it.

He did not recall telling the deputy sheriff the Scout was his, or McCormick telling him he had hidden the tags to the Scout. He said McCormick brought the tags to the Scout home with him from Suzie Johnson's and that they were taken by his former wife. He said he did not know how the North Carolina tags from the Cougar got into his house.

The State's theory of the case was that Edgemon, deeply involved in these car thefts, became upset with McCormick when he wrecked the Scout because it had tags on it which could be traced to him and the key ring in the Scout contained his personal keys; that he killed McCormick to prevent discovery of his complicity in these crimes.

The defense's objection to the evidence of the car theft scheme is based on Ark. Stat. Ann. § 28-1001, Rule 404 (b) (Repl. 1979), which reads:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Of course that is the general rule. *Moser* v. *State*, 266 Ark. 200, 583 S.W. 2d 15 (1979); *Tarkington* v. *State*, 250 Ark. 972, 469 S.W. 2d 93 (1971); *Alford* v. *State*, 223 Ark. 330, 266 S.W. 2d 804 (1954). But the rule itself says that such acts may be admissible for other purposes, and specifically mentions proving motive as one such purpose. 2 WEINSTEIN'S EVIDENCE, par. 404 [14].

In *Price* v. *State*, 268 Ark. 535, 597 S.W. 2d 598 (1980), we found that an accomplice's testimony that implicated the defendant in other car thefts was not prejudicial error because it went to intent and corroborated the accomplice's statement. In *Dillon* v. *United States*, 391 F. 2d 433 (10th Cir. 1968) evidence that the defendant was a part of an abortion ring was admissible to show motivation to commit bribery, the charge against the defendant. In *United States* v. *Haldeman*, 559 F. 2d 31 (D.C. Cir. 1979), evidence of

burglary of a psychiatrist's office was admissible to show a motivation for the "Watergate cover-up."

The State made a strong case that Edgemon and his family were inextricably involved with the stolen cars: Edgemon did not seek to recover the Scout after it was wrecked or notify anyone it was his; there is evidence he tried to conceal any link that existed between him and the Scout and the Cougar; he made several incriminating statements, one of which suggested that McCormick's death would be no great loss. The evidence of the stolen vehicles, and his involvement with them, was relevant to whether he had a reason to kill McCormick.

Edgemon's other arguments only merit mention. The day before the trial actually began an attempt was made to assassinate President Reagan. The defense made a motion the next day for a mistrial or a continuance because of the inflammatory nature of the incident and its effect on the jury. The appellant cites no direct authority for his position but argues that a defendant cannot get a fair trial in such an atmosphere. There was no evidence offered to support the motions, nor was the jury voir dired. There is no precedent that court proceedings must cease because of a tragic incident involving a national figure. We will not presume that juries will fail in their sworn duty. Prejudice will not be presumed. *Russell* v. *State*, 262 Ark. 447, 559 S.W. 2d 7 (1977). We cannot say the judge's decision to deny these motions was an abuse of discretion. *McCree* v. *State*, 266 Ark. 465, 585 S.W. 2d 938 (1979); *Mays* v. *State*, 264 Ark. 353, 571 S.W. 2d 429 (1978).

The appellant had a school superintendent, who was a frequent hunter, conduct a test by firing a shotgun at a small mattress. When the judge denied the admissibility of the evidence, Edgemon proffered the testimony of this witness to show that a shotgun fired at close range, would send the shot totally through the mattress. There was no evidence that any of the shot went completely through the mattress found near McCormick's body. Naturally, the results would have been different in a test where a shotgun was merely fired at a mattress and one where the shot went through a body on a

mattress. Also, the gun used in the test was not the same as the one the State claimed did the deed, nor was the distance verified to be the same. The admissibility of such evidence is a discretionary matter and we cannot say the court abused its discretion. *Hamblin* v. *State,* 268 Ark. 497, 597 S.W. 2d 589 (1980); *Houston* v. *State,* 165 Ark. 294, 264 S.W. 869 (1924).

The argument that the evidence against the appellant is insufficient is essentially answered in our recitation of the facts. We have examined the transcript for other errors as we are required to do, and, finding none that would require reversal, affirm the judgment.

Affirmed.