Jason McGEHEE *v.* STATE of Arkansas

CR 98-510 992 S.W.2d 110

Supreme Court of Arkansas
Opinion delivered June 17, 1999

154

*Llewellyn J. Marczuk*, Arkansas Public Defender Commission; for appellant.

*Mark Pryor*, Att'y Gen., by: *C. Joseph Cordi, Jr.*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Jason McGehee appeals the judgment of the Boone County Circuit Court convicting him of the capital murder of fifteen-year-old John Melbourne Jr. and sentencing him to death by lethal injection. Appellant was also convicted of kidnapping Melbourne and was sentenced to life imprisonment on that charge. Our jurisdiction is thus pursuant to Ark. Sup. Ct. R. 1-2(a)(2). For reversal, Appellant argues that (1) there was insufficient corroborating evidence to convict him of the crimes; (2) the trial court erred in allowing into evidence testimony about prior bad acts and other crimes committed by Appellant; (3) there was insufficient evidence to support the aggravating circumstance that Appellant committed the murder to avoid arrest; and (4) the trial court erred in limiting his presentation of mitigating evidence during the penalty phase of the trial. We find no error and affirm.

The underlying facts of this criminal episode are set out in detail in *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899 (1999). We see no need to repeat those facts in their entirety. Suffice it to say that on August 19, 1996, Appellant, Benjamin McFarland, Christopher Epps, Candace Campbell, and, to a lesser extent, Robert Diemert held John Melbourne Jr. against his will and severely beat him for "snitching" on them. The beating initially occurred at Appellant's house in Harrison and later continued at Appellant's uncle's house in Omaha, Arkansas. After having beaten the boy for approximately two hours, Appellant, McFarland, and Epps took Melbourne out behind the house in Omaha, into a wooded area, and strangled him. Melbourne's naked body was discovered by police over two weeks later, on September 3, 1996. Appellant, Epps, and McFarland were arrested and charged

with capital murder and kidnapping, while Campbell and Diemert were charged with battery and kidnapping. McFarland and Epps were tried separately and convicted of both crimes; both men received life imprisonment without the possibility of parole. Appellant was the last codefendant tried; he, too, was convicted of both crimes, but was sentenced to die by lethal injection. This appeal followed.

## I. Corroborating Evidence of Accomplice Testimony

For his first point for reversal, Appellant argues that the trial court erred in denying his motion for directed verdict on the ground that there was insufficient evidence to corroborate the testimony of accomplices Epps, Campbell, and Diemert. We treat motions for directed verdict as challenges to the sufficiency of the evidence. *Marta v. State*, 336 Ark. 67, 983 S.W.2d 924 (1999). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Id.*

Arkansas Code Annotated § 16-89-111(e)(1) (1987) provides that a person cannot be convicted of a felony based upon the testimony of an accomplice, unless that testimony is "corroborated by other evidence tending to connect the defendant with the commission of the offense." Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Id.* The test for determining the sufficiency of the corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Marta*, 336 Ark. 67, 983 S.W.2d 924. Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. *Id.* Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Id.*

The record reflects that at the conclusion of all the evidence, the trial court instructed the jury that Epps was an accomplice to the capital murder as a matter of law; thus, there is no dispute that his testimony must be corroborated as to that charge. The trial

court also instructed the jury that Epps, Campbell, and Diemert were accomplices to the kidnapping as a matter of law; hence, their testimony must be corroborated by other evidence of the kidnapping. The trial court did not, however, instruct the jury that Campbell and Diemert were accomplices to the capital murder, either as a matter of law or fact. It is not apparent from the record that Appellant ever requested that Campbell and Diemert be submitted as accomplices to the capital murder. At the conclusion of the State's evidence, defense counsel made the following motion:

> Your Honor, the defense moves for a directed verdict based upon the sufficiency of the evidence. First on the kidnapping charge, we argue that there's no corroboration. *All the testimony of the kidnapping* came from Candace Campbell, Robert Diemert, and Chris Epps, who were all co-defendants and accomplices with Jason McGehee and, therefore, it is not sufficient merely to show that a crime was committed but that this defendant committed a crime and there's no corroboration on that issue.

> Similarly, on the capital murder charge, there's no corroboration that he aided, abetted or solicited or participated in the murder other than being present which is not sufficient. And again, it's not sufficient merely to show that a crime was committed, so we move for a directed verdict on those two issues. [Emphasis added.]

We do not view counsel's statements as a request to have the jury decide the issue of Campbell's and Diemert's status as accomplices to the capital murder. Accordingly, we agree with the State that Appellant is now procedurally barred from arguing that they are accomplices to the murder.

 The appellant bears the burden of proving that a witness is an accomplice whose testimony must be corroborated. *Lloyd v. State*, 332 Ark. 1, 962 S.W.2d 365 (1998). A defendant must either have the trial court declare a witness to be an accomplice as a matter of law or submit the issue to the jury for determination. *Hogue v. State*, 323 Ark. 515, 915 S.W.2d 276 (1996); *Rockett v. State*, 319 Ark. 335, 891 S.W.2d 366 (1995). Where the witness was never found to be an accomplice, and that appellant failed to request that accomplice instructions be submitted to the

jury for consideration, the issue is not preserved for our consideration. *Lloyd*, 332 Ark. 1, 962 S.W.2d 365; *Rockett*, 319 Ark. 335, 891 S.W.2d 366.

█ In the present case, Appellant did not request that Campbell and Diemert be declared to be accomplices to the capital murder as a matter of law, nor did he request that their status be submitted to the jury for determination. Rather, Campbell and Diemert were only declared to be accomplices on the charge of kidnapping. Thus, only Epps's testimony must be corroborated on the murder charge.

## A. Corroboration of Capital Murder

The record reflects that on August 19, 1996, John Melbourne Jr. and Anthony Page went to Cooper's Shoe Store in Harrison to cash a stolen check. The store's owner, Rick Harness, testified that the two young men found some shoes and attempted to pay for them with a payroll check made out to John Melbourne for about $125. Harness told them that he could not accept the check because it was not filled out completely. They left and returned thirty minutes later with the check filled out properly. Harness sold them the shoes and gave them cash for the difference. After they left the second time, Harness became suspicious and called the bank about the check. Upon being informed that the check was stolen, Harness called the police.

Officer Mark Rupp of the Harrison Police Department arrived at the shoe store to investigate the incident. While he was there, one of the employees noticed that the guy who passed the check was standing across the street wearing the shoes he had just purchased. Melbourne and Page were subsequently arrested and questioned. Officers seized the shoes and cash from Melbourne as evidence and gave him a property receipt for them. Melbourne told Officer Rupp about the circumstances surrounding the incident at the shoe store. He also told the officer where he got the check. Acting upon Melbourne's information, Officer Rupp recovered stolen checks from an open basement area under Appellant's house at 1123 North Spring Street in Harrison. The checks had the same name on them as the check cashed by Melbourne at

the shoe store. Officers also recovered other stolen property from the house.

Candace Campbell testified that during the afternoon of August 19, 1996, Appellant told Melbourne to cash a stolen check at a local shoe store. The check had been made out by Appellant's girlfriend, Mandy Trice. Campbell stated that Melbourne went to the store twice, and that he did not come back after the second visit. While he was gone, the police came to Appellant's house. Appellant, McFarland, Epps, and Campbell hid in the back of the house where they could see the officers through a hole in the floor. They watched as the officers entered the open basement area and recovered some stolen property. After the officers left, the group surmised that Melbourne must have been caught attempting to pass the stolen check and had told the police what had happened. The group then decided that they should beat up Melbourne because he had "snitched" on them. McFarland and Epps left with the neighbor, Charla Bright, to look for Melbourne. They went with Bright because she was the only one who had a car. A short time after they returned, Melbourne also returned. Melbourne was greeted by Appellant, who asked him what had happened and what he had told the police. Melbourne admitted that he had been arrested, but he denied telling the police anything. Melbourne showed Appellant a piece of paper, presumably the property receipt that he received from the police when they seized the shoes. Epps suddenly came at Melbourne and began hitting and kicking him. When Epps stopped, Appellant started talking to Melbourne again. Eventually, Appellant began hitting Melbourne. Campbell stated that Appellant was mad that Melbourne had "snitched" on them for writing the checks and having the stolen property because he would have to go to prison. Appellant continued hitting Melbourne for about ten or fifteen minutes, after which Epps and McFarland joined in and began hitting and kicking him, too. Campbell admitted that she also hit Melbourne a couple of times.

According to Campbell, the group continued to beat Melbourne for over an hour. Afterwards, Appellant went over to a neighbor's house where Diemert was visiting. Diemert came back with Appellant and they all left to go to Utah. It was Appel-

lant's idea to go to Utah, as he had relatives there. They left in Diemert's car, with Melbourne sitting in the back seat between McFarland and Epps. Melbourne was tied up and weakened from the beating; he was swollen, and there were a lot of bruises and red marks on his body. It was Appellant's idea to stop in Omaha, Arkansas, before they went to Utah. Appellant gave Diemert directions on how to get to his uncle's house in Omaha. Campbell stated that at first, the plan was to drop off both Epps and Melbourne in Omaha. During the drive, however, she heard either McFarland or Epps ask Melbourne how it felt knowing that he was going to die. When they arrived at Appellant's uncle's house, the group again proceeded to beat Melbourne for approximately one hour. Appellant hit and kicked Melbourne and also threw a box fan at him, hitting him once in the chest and the second time in the head. Melbourne attempted to escape through the kitchen, but he was caught and thrown to the ground by Appellant, Epps, and McFarland.

Campbell stated that Appellant did most of the beating at Omaha. Appellant also asked Melbourne what it felt like knowing that he was going to die. At one point, Appellant, McFarland, Campbell, and Diemert went out on the front porch to smoke. While they were outside, Appellant suggested that they get rid of Melbourne. Appellant told Diemert and Campbell to wait in the car. Appellant, Epps, and McFarland then took Melbourne out behind the house. After they had been gone for ten or fifteen minutes, Campbell heard someone yell. She stated that they were gone for at least thirty minutes, and that when they returned, Melbourne was not with them. Appellant, Epps, and McFarland then went back inside the house to make sure that they had not left anything behind. The group then left for Utah, stopping first at a local gas station. While at the gas station, McFarland pulled Campbell aside and told her that they had taken Melbourne's life. Part of the group eventually made it to Utah, where Appellant, McFarland, and Campbell broke into Appellant's aunt's house and stole her car, a checkbook, and some other items, and were later arrested by the Utah authorities. Shortly thereafter, Campbell told the Boone County authorities about the murder and where they could find the body.

Diemert testified that he had rented the house at 1123 Spring Street and that he let Appellant move in with him. Diemert moved out sometime in July 1996. On the night of August 19, 1996, Diemert was visiting a friend that lived on Spring Street. Appellant approached him that night about going to Utah. Diemert stated that Appellant had previously talked to him about moving to Utah and getting jobs, but that he had not planned to go to Utah that night until Appellant approached him about it. Diemert stated that it was Appellant's decision to go to Omaha, where his uncle lived. On the way, Diemert heard Appellant ask Melbourne how it felt to know that he was going to die. Once they arrived at Appellant's uncle's house, the group began hitting Melbourne and asking him why he had snitched on them. According to Diemert, Appellant hit Melbourne with a box fan and struck him with a stick eight or nine times. Appellant, McFarland, and Epps also hit Melbourne in the head numerous times with a wooden ax handle. At one point, Appellant put a butcher's knife to Melbourne's throat. Diemert admitted that he hit Melbourne one time because Appellant told him to do so. At some point after they had beaten Melbourne, Diemert, Appellant, McFarland, and Campbell went outside to smoke and to discuss what they should do next. Appellant then told Diemert and Campbell to wait in the car. Diemert watched as Appellant, McFarland, and Epps took Melbourne down into the woods behind the house. Diemert saw that Melbourne was naked and his hands were tied. About thirty minutes later, Appellant, Epps, and McFarland came out of the woods without Melbourne. Diemert stated that the three of them were laughing. Appellant told Diemert not to worry about Melbourne because he was fine.

Charla Bright, Appellant's neighbor, testified that on August 19, 1996, she took Epps and McFarland riding around with her to look for some drugs. They ran into Melbourne on Main Street. Epps and McFarland shouted to Melbourne to follow them. Bright then pulled into a parking lot where Epps and McFarland talked to Melbourne. After they finished talking, Epps and McFarland told Bright to take them back to Spring Street. Bright dropped them off and then went home. Later that evening, Bright, Epps, and McFarland went riding around again. This time

they went looking for drugs on the town square, where they encountered Anthony Page. McFarland talked to Page, while Epps and Bright waited in the car. Afterwards, Bright dropped off McFarland and Epps at Appellant's house.

At some point during the evening, Bright heard something hitting or thumping against the wall of Appellant's house. She went over to see what was happening, but when she knocked on the door, they would not let her enter; instead, they opened the door slightly and told her that they would be out in a little bit. She then went home. Upon hearing more of the same noise, Bright went back to Appellant's house. This time, when they opened the door, she stuck her foot between the door and the jam and used her hip to force open the door. From the doorway, she saw Melbourne in the front bedroom, standing up against the wall where McFarland and Epps were beating him. Appellant appeared to be in charge of Melbourne's beating. Bright asked Campbell what was going on, and Campbell told her not to worry about it because she was just going to get herself into trouble. Appellant soon came over to Bright and told her not to worry about it, that Melbourne was his "homey" and that they were not going to hurt him. Appellant told her that Melbourne had "narked them out" about the stolen checks, and that if they were in a bigger city, Melbourne would be killed for what he had done. Appellant assured her that Melbourne was their friend and that they were just going to teach him a lesson. Later that night, Bright heard people at Appellant's house slamming doors and yelling "let's go," and saying that they were in a hurry.

Anthony Page testified that on August 19, 1996, he went with Melbourne to the shoe store to cash the stolen check and was subsequently arrested with Melbourne. Page said he knew that the check was stolen because it was on the same account as a check that he had previously cashed for Appellant. On the night that he and Melbourne were arrested, Page was approached by McFarland on the town square. Page stated that McFarland told him that Melbourne had snitched on them, and that they had him at the house where "he was in the process of getting the worse [*sic*] ass beating of his life[.]"

Other corroborating evidence of Appellant's participation in the capital murder included the following testimony. Charles McMahan testified that he owned the farm residence where Melbourne's body was found. During August 1996, McMahan had rented the place to a man by the name of McGehee. Appellant stipulated that his uncle had lived in the house. Detective Marc Arnold, of the Harrison Police Department, testified that he had accompanied Carrie Myers, Appellant's landlord, to the residence on Spring Street three days after the murder. While he was inside the house, Arnold found the property receipt that had been issued to Melbourne the day that he was arrested. Al Rowland, from the Arkansas State Crime Laboratory, examined the receipt and found Appellant's left thumb print on the document. Dr. Charles Kokes, an associate medical examiner at the State Crime Laboratory, performed an autopsy on Melbourne's body, which was severely decomposed. Dr. Kokes testified that there was evidence of trauma to Melbourne's skull. Particularly, he found numerous small fractures on the front of the cranium, around the nasal aperture, on the left cheekbone, and near the left orbit, the bony depression that houses the eyeball. Additionally, there were two traumatic indentations on the right side of the front of the skull. Dr. Kokes stated that the fractures were indicative of blunt force being used on the victim, and that the injuries he observed would be consistent with multiple beatings over a long period of time by persons using fists, feet, and various other devices. Dr. Kokes indicated that the manner of Melbourne's death was homicide, and that the blunt-force injuries to the victim's head played a part in his death.[1]

■ The foregoing testimony is sufficient to independently establish that John Melbourne Jr. was murdered and that Appellant was connected to his murder. Appellant was motivated to harm Melbourne because he thought that Melbourne had "snitched" to police about his criminal activity. It was Appellant's idea to flee to Utah and to stop at his uncle's house in Omaha, where Melbourne's body was later found partially hidden behind some

---

[1] Dr. Kokes was not able to examine the body for evidence of strangulation, as the soft tissue around the neck had already completely decomposed.

bushes. The evidence supports the State's theory that Appellant was the leader of this group of people, and that he orchestrated the events of August 19, 1996, that culminated in Melbourne's murder. We thus conclude that there was sufficient corroborating evidence that Appellant committed the offense of capital murder. We turn now to the sufficiency of the evidence on the charge of kidnapping.

## B. Kidnapping

A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty for the purpose of inflicting physical injury upon him or terrorizing him. Ark. Code Ann. § 5-11-102 (Repl. 1997). Epps, Campbell, and Diemert were declared to be accomplices as a matter of law on the charge of kidnapping Melbourne. The question then is whether, excluding their testimony, the other evidence independently establishes that Melbourne was kidnapped and tends to connect Appellant with the crime. We conclude that it does.

As discussed above, Anthony Page testified that after he and Melbourne were arrested and released, McFarland approached Page on the town square and inquired about whether Page knew that Melbourne had been arrested and whether he had snitched on them. Page denied knowing anything about it, as he was afraid of what might happen to him if they found out that he and Melbourne had "snitched." Page said that McFarland then proceeded to tell him that Melbourne had snitched on them and that "*they had him at the house* and he was in the process of getting the worse [*sic*] ass beating of his life[.]" (Emphasis added) Similarly, Charla Bright testified that when she went over to Appellant's house and let herself in the front door, she saw Melbourne up against the wall in the bedroom while McFarland and Epps were beating him. She also stated that Appellant was in charge of Melbourne's beating. This testimony establishes that Melbourne was at Appellant's house against his will and that he was being restrained by the group for the purpose of terrorizing him or inflicting physical injury upon him.

■ Additionally, there was testimony from Lisa Sakevisius, Chief Criminalist at the Arkansas State Crime Laboratory, that a hair found on the couch at Appellant's uncle's house in Omaha was similar in nature and could have a common origin with the hair found in Melbourne's bedroom and the hair that came from the head of the victim's body. We agree with the State that this evidence suggests that Melbourne was alive when he was brought to the house in Omaha, thus supporting the kidnapping charge. We thus affirm the trial court's denial of the directed-verdict motion.

## II. Evidence of Other Crimes and Prior Bad Acts

For his second point for reversal, Appellant argues that the trial court erred in allowing the State to present evidence of other crimes and prior bad acts in which he participated. Specifically, Appellant challenges the admission of (1) evidence of the forgeries and burglaries that occurred both prior to and after the murder, and (2) evidence of the beating of Clinton Spears.

■ ■ Rule 404(b) of the Arkansas Rules of Evidence provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, but such evidence is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Johnson v. State*, 333 Ark. 673, 972 S.W.2d 935 (1998). Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Id.* The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997). Correspondingly, the trial court has the discretion to determine whether prejudicial evidence substantially outweighs its probative value, and its judgment will be upheld absent a manifest abuse of discretion. *Parker v. State*, 333 Ark. 137, 968 S.W.2d 592 (1998).

It was the State's theory that Appellant was the leader of a forgery ring, giving stolen checks to the other members of the group and instructing them to cash the checks and bring back the money. The State contended that such evidence showed how Appellant manipulated the group to carry out his criminal objectives. The State contended further that it was necessary to discuss the forgeries to set the scene of the murder and the subsequent flight from authorities. Additionally, the State argued that evidence of the burglaries, during which the checks and property found at Appellant's house were taken, specifically showed Appellant's motive to kill Melbourne because only he and Melbourne knew where the property was hidden. Thus, when the police came to the house and recovered the stolen property, Appellant knew that Melbourne had talked to the police, as he was the only other person who knew about the property. This theory was supported by Epps's testimony that Appellant said that "someone had to snitch and the only two people that knows where it was was me and John."

The trial court, being familiar with the evidence from having already presided over McFarland's and Epps's trials, ruled:

> I see no way of trying this case without the whole — all the events leading up [to] the murder of Mr. Melbourne starts out with a forgery and with these various individuals there in the house when the police come to look for and find stolen property in back of the house. The whole circumstances of the case is just unavoidable. To explain the circumstances leading up [to] the crime, I don't see how else to deal with it.

▮▮▮ We concur with the trial court's assessment of the situation. "Our court has repeatedly held that all the circumstances surrounding a particular crime may be shown, even if those circumstances would constitute a separate criminal act or acts, when the criminal acts are intermingled and contemporaneous with one another." *Brown v. State*, 305 Ark. 53, 54-55, 805 S.W.2d 73, 74 (1991) (citing *Wilson v. State*, 298 Ark. 608, 770 S.W.2d 123 (1989); *Henderson v. State*, 284 Ark. 493, 684 S.W.2d 231 (1985)). Furthermore, this court has repeatedly held that when the purpose of the evidence is to show a motive for killing, anything and everything that might have influenced the commission of the act

may, as a rule, be shown. *See, e.g., Lee v. State*, 327 Ark. 692, 942 S.W.2d 231, *cert. denied*, 118 S. Ct. 572 (1997); *Scott v. State*, 325 Ark. 267, 924 S.W.2d 248 (1996). *See also Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), *cert. denied*, 520 U.S. 1242 (1997) (holding that the relevance of circumstances that tie the perpetrator to the victim and raise a possible motive for the killing is patently obvious); *Edgemon v. State*, 275 Ark. 313, 630 S.W.2d 26 (1982) (upholding the trial court's ruling that evidence showing the defendant's involvement in a car-theft ring was relevant to the issue of whether he had reason to kill the victim).

 Here, the evidence of Appellant's participation in the uncharged acts of forgery and burglary was properly admitted as proof of his motive for killing Melbourne. The evidence of his flight to Utah and his subsequent arrest there was also properly admitted to show the circumstances surrounding the crime. Moreover, as discussed in the next section, that evidence supports the jury's conclusion that the murder was committed for the purpose of avoiding or preventing arrest. We thus find no error with the trial court's ruling.

Likewise, we find no error with the trial court's decision to admit evidence of Appellant's participation in the beating of Clinton Spears. Page testified that a week or two before the murder, he met Appellant, McFarland, Melbourne, and Spears at the Harrison town square. They asked Page if he would drive them down Cottonwood Road, a remote country road, so they could smoke some marijuana. Page agreed to do so. They drove down Cottonwood Road and stopped in a field somewhere off the road. It was dark. They all got out of the car, and Appellant and McFarland immediately started "whaling on" Spears, punching and kicking him. Appellant and McFarland were doing most of the hitting, but Melbourne also participated. Page testified that they were beating Spears because "he snitched on them for something." Page stated further that during the beating, Appellant stated numerous times that he wanted to kill Spears. At that point, Page told everyone to get into the car and they left. Spears refused to go with them, so they left him there. Page stated that Appellant and McFarland were equally in charge of beating Spears, but that Appellant had suggested where to go and where to stop.

█ The State contended that evidence of Appellant's participation in the beating of Spears for "snitching" on them was relevant to show his motive for kidnapping, beating, and killing Melbourne. We agree. Evidence of a defendant's bad acts may be introduced if they tend to prove the defendant's motive for committing the crime at hand. *Hodge v. State*, 332 Ark. 377, 965 S.W.2d 766 (1998). To be admissible, there must be a very high degree of similarity between the charged crime and the prior uncharged act. *Johnson*, 333 Ark. 673, 972 S.W.2d 935. However, the degree of similarity between the charged crime and the prior uncharged act is a determination that affords considerable leeway to the trial judge and may vary with the purpose for which the evidence is admitted. *Sasser v. State*, 321 Ark. 438, 902 S.W.2d 773 (1995).

█ Here, Appellant was accused of kidnapping and killing Melbourne because he had "snitched" to the police about Appellant's participation in the forgeries and burglaries. Only a week or two earlier, Appellant had participated in the beating of Clinton Spears because he, too, had "snitched" on him. The similarities between the two incidents are sufficient for admission under Rule 404(b). Both instances involved the members of Appellant's group finding someone to drive them and the victim to an isolated area where the victim was beaten and left behind. Both instances also involved threats made by Appellant to kill the victims. In both instances, Appellant directed the driver to the isolated area where the victim was to be taken. Moreover, in both instances the motivation for the attack was the group's suspicion that the victims had told the police about their illegal activities. Furthermore, the prior crime was committed sufficiently close in time to the charged crimes so as to have particular bearing on Appellant's motive and plan in committing the charged crimes.

█ We cannot say that the trial court abused its discretion in allowing the evidence of Appellant's participation in the beating of Spears, as it was independently relevant to show his plan, motive, and intent to kidnap and murder Melbourne. The State is entitled to produce evidence showing circumstances that explain the act, show a motive for killing, or illustrate the defendant's state of mind. *Lee*, 327 Ark. 692, 942 S.W.2d 231; *Scott*, 325 Ark. 267,

924 S.W.2d 248. The jury was properly instructed that such evidence was not to be considered to prove Appellant's character or that he acted in conformity therewith, but was merely offered as evidence of motive, opportunity, intent, preparation, plan, and knowledge of the crimes with which he was charged. We thus affirm the trial court's ruling on this issue.

### III. Aggravating Circumstance of Preventing or Avoiding Arrest

For his third point for reversal, Appellant argues that there was insufficient evidence to support the jury's finding that he committed the capital murder to avoid or prevent his arrest for the underlying felonies of forgery and burglary. He asserts that the evidence was just as suggestive that the murder was motivated purely by anger and retaliation, and that, therefore, there is not substantial evidence to support the aggravating circumstance. We disagree.

This court may affirm a jury's finding that an aggravating circumstance exists beyond a reasonable doubt only if the State has presented substantial evidence in support of each element of the aggravating circumstance. *Greene v. State*, 335 Ark. 1, 977 S.W.2d 192 (1998). Substantial evidence is evidence that is forceful enough to compel reasonable minds to reach a conclusion one way or the other and permits the trier of fact to reach a conclusion without having to resort to speculation or conjecture. *Id.* We review the sufficiency of the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943, *cert. denied*, 519 U.S. 982 (1996).

Arkansas Code Annotated § 5-4-604(5) (Repl. 1997) provides for the aggravating circumstance that the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody. This aggravating circumstance is "apparently designed to deter deliberate murderous acts subversive of the criminal justice system in particular and social order in general, and to protect certain persons deemed especially

important to the integrity of both, including law enforcement officers, prison guards, and *actual or potential witnesses in judicial proceedings.*" *Id.* at 200, 919 S.W.2d at 954 (emphasis added) (quoting Thomas M. Fleming, Annotation: *Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Committed to Avoid Arrest or Prosecution, to Effect Escape from Custody, to Hinder Governmental Function or Enforcement of Law, and the Like — Post-Gregg Cases,* 64 A.L.R.4th 755, 763 (1988 and Supp. 1995)(footnote omitted)). A common thread in many of this court's prior decisions involving this aggravating circumstance is that the murder was committed to avoid arrest or to eliminate a witness to another offense committed in connection with the murder. *Id.* Indeed, this court has held that killing a victim to eliminate a witness is the same thing as avoiding or preventing arrest. *Sheridan v. State,* 313 Ark. 23, 852 S.W.2d 772 (1993).

 The evidence in the present case supports the jury's conclusion that Appellant committed the murder for the purpose of preventing his arrest on the other crimes. The primary motivation for kidnapping, beating, and killing Melbourne was that he had informed the police about the group's criminal activities. There was testimony that only Appellant and Melbourne knew about the prior burglary that resulted in the stolen property kept at Appellant's house and subsequently recovered by the police. Melbourne's death thus eliminated the possibility that he would later testify against Appellant or the other members of the group. The jury's conclusion is further supported by the group's decision to avoid arrest by fleeing to Utah and the fact that they disposed of Melbourne before leaving the state. We thus affirm the trial court's ruling on this issue.

## IV. *Mitigating Evidence*

For his last point for reversal, Appellant argues that the trial court erred in limiting the mitigating evidence that he was allowed to present during the penalty phase of the trial. Particularly, Appellant urges three errors: (1) not allowing him to present the

commitment orders of McFarland and Epps; (2) limiting the testimony of LaDonna McGehee, Appellant's ex-wife, and Linda Christensen, Appellant's aunt; and (3) restricting the time for Appellant's closing argument.

 Arkansas Code Annotated § 5-4-602(4) (Repl. 1997) provides in pertinent part:

> Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, *but mitigation evidence must be relevant to the issue of punishment,* including, but not limited to, the nature and circumstances of the crime, and the defendant's character, background, history, and mental and physical condition as set forth in § 5-4-605. [Emphasis added.]

Although the rules of evidence are not applicable to the admissibility of mitigating evidence, this statute does not open the way for the admission of irrelevant evidence. *Pickens v. State,* 301 Ark. 244, 783 S.W.2d 341, *cert. denied,* 497 U.S. 1011 (1990), 500 U.S. 929 (1991). Indeed, this court has previously held that in passing this statute, "the legislature did not intend to totally open the door to any and all matters simply because they might conceivably relate to mitigation[.]" *Johnson v. State,* 308 Ark. 7, 27, 823 S.W.2d 800, 811, *cert. denied,* 505 U.S. 1225 (1992) (citing *Hobbs v. State,* 273 Ark. 125, 617 S.W.2d 347 (1981)). Thus, to be admissible, evidence of mitigating circumstances must be relevant to the issue of the defendant's punishment.

 Appellant first argues that the trial court erred in refusing to admit into evidence the commitment orders of his codefendants who had been sentenced to life imprisonment without the possibility of parole. Appellant's theory was that because the codefendants were equally liable as accomplices to the capital murder, they should be equally punished. Appellant cites no authority or convincing argument in support of his theory, and we are not aware of any. We have stated on occasions too numerous to count that this court will not reverse where the appellant has offered no convincing argument or authority and it is not

apparent without further research that the argument is well taken. *See, e.g., Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998); *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998); *Morgan v. State*, 333 Ark. 294, 971 S.W.2d 219 (1998). In any event, Appellant succeeded in getting part of this information to the jury when Epps stated on cross-examination that he was currently imprisoned at the Varner unit of the Arkansas Department of Correction and that he was not on death row.

▬▬ Appellant next argues that the trial court erred in limiting the testimony of two defense witnesses. He first asserts that it was error to refuse to allow Appellant's ex-wife LaDonna McGehee to ask the jury for leniency in sentencing Appellant. The record reflects that defense counsel asked Ms. McGehee "Is there any statement you want to make to the jury regarding his sentence?" The prosecutor objected to the question, and the trial court sustained the objection. Defense counsel did not make a proffer to the trial court as to what Ms. McGehee's testimony would be. Rule 103 of the Arkansas Rules of Evidence requires a party to make a proffer of the testimony or evidence sought to be admitted unless it is clear from the context of the questions asked what the evidence would be. *See, e.g., Echols*, 326 Ark. 917, 936 S.W.2d 509; *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), *cert. denied*, 517 U.S. 1226 (1996); *Jones v. State*, 321 Ark. 649, 907 S.W.2d 672 (1995). Here, Appellant made no proffer of the witness's testimony, and it is not clear from the context of the question what particular information Appellant sought to introduce. We thus decline to consider this argument, as it is not preserved for our review. *See Jones*, 321 Ark. 649, 907 S.W.2d 672.

Appellant also submits that it was error for the trial court to limit Linda Christensen's testimony in two separate instances. In the first instance, Appellant asserts that she should have been allowed to testify as to what happened to Appellant's dogs when he was a small child. The record reflects that Ms. Christensen was testifying about how Appellant's mother had made him sleep outside with the dog and would not allow him into the house for seven to ten days. She stated that Appellant was living out there

with his dog, in a dog run that had no cover on it. She then stated that her family was weird about how they handled their animals. Defense counsel then asked Ms. Christensen what happened to Appellant's dogs when he was a small child. Ms. Christensen replied that "[w]hen he was a baby, he had a Doberman Pinscher[.]" The State objected on the ground that the testimony was irrelevant. The trial court sustained the objection. Defense counsel offered no explanation as to why that particular evidence was relevant, stating only that the jury needed to know the background of why Appellant did what he did. After the jury retired for deliberation, defense counsel proffered that Ms. Christensen would have testified that Appellant's family blamed Appellant when the dogs' throats had been slit, telling him that God had killed the animals because he wanted a new puppy.

 We cannot say that the trial court's decision to deny admission of the testimony was erroneous, given that, at the time the trial court made its ruling, it was not clear where defense counsel was going with the testimony. Moreover, we cannot say that the trial court erred in finding the evidence irrelevant to Appellant's punishment, in light of the fact that the testimony merely described the family's attitude about the death of their dogs, an event that occurred when Appellant was just a baby. A trial court has wide discretion in admitting evidence, including that presented during the penalty phase of the trial, and we will not reverse the trial court's ruling absent an abuse of discretion. *See McClish v. State*, 331 Ark. 295, 962 S.W.2d 332 (1998); *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998).

 In the second instance, Appellant asserts that Ms. Christensen should have been permitted to testify about Appellant's stepfather's abuse of Appellant's sister. It is not clear from Appellant's brief how this evidence would be relevant to the issue of his punishment. In any event, this argument is moot because the witness testified that Appellant's stepfather beat up his sister and that family services were called in because the girl had big bruises on the back of her legs. Although the State objected to the testimony and the trial court sustained the objection, the jury

was never admonished not to consider the evidence. Thus, for all intents and purposes, Appellant succeeded in presenting the testimony he sought to introduce.

 Lastly, Appellant argues that the trial court erred in restricting his time for closing argument during the penalty phase. The record reflects that defense counsel requested forty-five minutes for closing argument, but stated that he could actually do it in about thirty minutes. The trial court rejected the request and gave fifteen minutes to each side. We find no error with the trial court's ruling. The trial court has broad discretion in controlling closing arguments, and we will not reverse the trial court's decisions in such matters absent a manifest or gross abuse of discretion. *Puckett v. State*, 324 Ark. 81, 918 S.W.2d 707 (1996). We cannot say that the trial court's decision to restrict closing argument to fifteen minutes was a manifest abuse of its discretion. Moreover, when the trial court alerted defense counsel to the fact that he had gone over his time, and defense counsel requested one more minute, the trial court gave him the requested time. Appellant cannot now complain that the trial court unfairly restricted his argument when he received the relief requested. *See Noel*, 331 Ark. 79, 960 S.W.2d 439; *Jones v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996).

## V. Rule 4-3(h) Compliance

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal, and no such reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.