# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1984
No. 07-2115

_____

| | |
|---|---|
| Marcel Wayne Williams, | * |
| | * |
| Petitioner - Appellee/ | * |
| Cross Appellant, | * |
| | *   Appeals from the United States |
| v. | *   District Court for the |
| | *   Eastern District of Arkansas. |
| Larry Norris, Director, Arkansas | * |
| Department of Corrections, | * |
| | * |
| Respondent - Appellant/ | * |
| Cross Appellee. | * |

_____

Submitted: January 15, 2009
Filed: August 17, 2009

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

LOKEN, Chief Judge.

An Arkansas jury found Marcel Wayne Williams guilty of the capital murder of Stacy Errickson and sentenced him to death. The Supreme Court of Arkansas affirmed the conviction and sentence. The state trial court denied Williams's petition for state post-conviction relief, and the Supreme Court of Arkansas again affirmed. Williams then filed this petition for a federal writ of habeas corpus, alleging ineffective assistance of counsel and other claims. After an evidentiary hearing, the

district court granted the writ solely on the ground of ineffective assistance of counsel at the penalty phase of the trial. The State appeals, arguing that Williams established neither constitutionally deficient performance nor prejudice under Strickland v. Washington, 466 U.S. 668 (1984). Williams cross-appeals the dismissal of other claims. After careful review of the record, we reverse the grant of habeas relief and affirm the dismissal of the remaining claims.

## I. Factual and Procedural Background

Williams abducted Errickson from a suburban Little Rock convenience store on the morning of November 20, 1994. He brandished a firearm and pushed his way into her truck, forced her to withdraw $350 at several nearby ATMs, and then raped and murdered her. Nine days later, North Little Rock police arrested Williams on an outstanding warrant, suspecting he was involved in Errickson's disappearance and in sexual assaults of two other women. Williams waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and made inculpatory, contradictory statements over the course of a thirteen-hour interrogation. He confessed that he abducted Errickson and forced her to make ATM withdrawals but denied sexual assault and claimed that, as far as he knew, Errickson was still alive. On December 5, 1994, police found Errickson's body buried in a shallow grave in North Little Rock. Williams's semen was found in her vagina. The medical examiner identified the cause of death as asphyxia due to suffocation.

**A. The Trial.** Williams was charged with capital murder, kidnapping, rape, and aggravated robbery. Two attorneys were appointed to defend him. Lead attorney Herbert Wright, a former law clerk to a state judge, had five years experience as a criminal attorney in Little Rock and had been involved in three other capital cases, one of which went to trial. Phillip Hendry was in charge of the penalty phase. He had four years experience, including two and one-half years in the Little Rock public defender's office. He had represented defendants in two other capital trials and had

received training in representing capital murder defendants. A third attorney, William James, assisted the trial team. He had been licensed to practice for less than a year.

Williams's case was tried to a Little Rock jury in January 1997. During the guilt phase, defense counsel conceded guilt in the opening statement but vigorously challenged the State's evidence. That evidence, which the jury considered at the penalty phase, see Ark. Code Ann. § 5-4-602(4)(D), included autopsy photos, photos of Errickson's partially decomposed body being unearthed from a shallow grave, an ATM video showing her frightened face, testimony by other women Williams chased in his car shortly before abducting Errickson, and Williams's statement to police, in which he blamed others for the crimes and would not reveal the location of Errickson's body. He was convicted on all counts.

At the penalty phase, the State submitted three aggravating circumstances: a prior violent felony conviction (aggravated robbery), murder for pecuniary gain, and murder committed in an "especially cruel or depraved" manner. See id. § 5-4-604(3), (6), (8). The State's penalty phase evidence was compelling. Williams's prior convictions for aggravated robbery and kidnapping were introduced. Another woman testified that he abducted and sexually assaulted her four days after he abducted Errickson. Errickson's mother testified to the murder's effect on Errickson's four-year-old daughter:

> On Mother's Day we went to plant some flowers on her grave, because her mama always liked flowers. Instead of Brittany helping plant flowers, she started digging a hole, where she could go be with her mama. Many times she's wished that the mean man would come and get her, where she could go be with her mama, too.

Errickson's twin brother testified to her hard work and study to be a respiratory therapist, and the heartache of having to care for her grieving daughter.

The defense urged six mitigating circumstances: (1) extreme mental or emotional disturbance; (2) unusual pressures or influences; (3) reduced capacity to appreciate the wrongfulness of the offense conduct, or impairment as a result of mental disease or defect, intoxication, or drug abuse; (4) youth; (5) acceptance of responsibility; and (6) remorse. See id. § 5-4-605(1)-(4). The defense offered testimony by one witness, Michael Orndorff, an Arkansas inmate whose death sentence was commuted to life without parole and who testified that life without parole was more severe punishment because of the miserable conditions of prison life.

The jury unanimously recommended a death sentence, finding that the State proved all three aggravating circumstances beyond a reasonable doubt, that Williams proved one mitigating circumstance -- acceptance of responsibility -- by a preponderance of the evidence, and that the aggravating circumstances outweighed the mitigating circumstance beyond a reasonable doubt. See id. § 5-4-603. The trial court accepted the jury's recommendation. The Supreme Court of Arkansas affirmed. Williams v. State, 991 S.W.2d 565 (Ark. 1999) (Williams I).

**B. The State Post-conviction Proceedings.** Williams petitioned for state post-conviction relief under Rule 37 of the Arkansas Rules of Criminal Procedure. The trial court ordered an evidentiary hearing and appointed attorney William McLean to represent Williams during the post-conviction proceedings. McLean was qualified for a capital case appointment. See Ark. R. Crim. P. 37.5(c)(1). He had practiced criminal law for over ten years, served as lead counsel in other capital murder cases, handled other post-conviction matters, and tried at least 100 jury cases.

Williams initially urged many grounds for post-conviction relief but later withdrew all except one -- that his trial counsel rendered ineffective assistance at the penalty phase by failing adequately to investigate and present mitigating evidence of his difficult past. At the evidentiary hearing, Williams presented testimony by his three trial attorneys. All three testified that their trial strategy was to concede guilt,

in the face of the State's overwhelming evidence, and to seek mercy at the penalty phase. Lead penalty phase attorney Hendry testified that he and co-counsel interviewed Williams "a number of times," obtained his school, prison, and medical records, and reviewed the report of a state psychologist who examined Williams and determined he was competent to stand trial. See Ark. Code Ann. § 5-2-305(b)(1). As Hendry explained, this investigation apprised counsel of Williams's "troubled past":

> [H]e had been in training school early, you know, 11, 12, 13 years old. . . . Committed another offense that ended up getting him in the Department of Corrections. From talking with him, his mother didn't provide very much of a home life for him. I believe he had a step-father or another man living in the house who he had confrontations with. I don't believe that there was a lot of food . . . I think there were times where they didn't have what they needed. I believe there was some discussions of his mother having . . . a revolving door. . . . [S]he possibly used drugs and used drugs in his presence and he used drugs with her.

Hendry testified that counsel knew from Williams's prison records that he allegedly was raped by a fellow inmate at age sixteen, and had committed "major" disciplinary violations and received psychiatric treatment while incarcerated.

Counsel testified that they decided not to have Williams testify at the penalty phase because they feared damaging cross-examination about his drug use and criminal history and the gruesome details of the crime. Hendry considered Williams not to be a credible witness because of the numerous fabrications in his custodial statement. Williams told counsel he did not wish to testify. Counsel twice tried to interview Williams's mother, Sara Riggs, who briefly testified for the State during the guilt phase. Counsel elected not to call Riggs during the penalty phase because she was "not very cooperative" and because, when subpoenaed by the State to testify at a pre-trial hearing, she was "pitiful. . . . She could barely talk in front of just the judge and counsel." Counsel testified they did not try to contact Williams's half sister,

-5-

Peggy O'Neal, because Williams told them he and Peggy lost contact nearly a decade earlier. Attorney Wright testified that Williams did not identify other family members or persons who could testify about his background. Counsel tried to locate a witness to testify to the alleged prison rape but found no one.

Lead attorney Hendry testified that counsel elected to forgo presenting potentially mitigating social history evidence because neither Williams nor his mother would be a viable witness. Hendry emphasized his concern that any mitigating evidence presented through an expert could open the door to damaging cross-examination; "naturally, [when] somebody takes the stand, I think they're open to bring out the good and the bad." He was not asked whether he knew the defense could use a social history expert to gather and present such evidence. By contrast, Wright and James testified that they did not know that a social history expert could have testified to Williams's troubled past. Wright described this tactic as "foreign" at the time.[1] Inexperienced attorney James, whose opinion was entitled to little weight, testified that the testimony of Orndorff was not a product of "trial strategy."

The state trial court denied post-conviction relief. Applying Strickland, the court concluded that Williams failed to prove that counsel's decision not to develop and present expert social history testimony was prejudicial:

> What is obvious to this Court, is that we do not, nor cannot ever know what a psychiatrist would have said in Mr. Williams' trial. . . . Petitioner has offered no factual substantiation that convinces this Court that there is a reasonable probability that the outcome of the sentencing phase of

---

[1]Given Hendry's experience, Wright's selection of Hendry to be in charge of the penalty phase, and the cases cited in note 5, *infra*, we are inclined to think the district court clearly erred in assuming that Hendry was as ignorant in this regard as his co-counsel, an assumption critical to the court's conclusion that counsel were guilty of deficient performance under Strickland. But we put this concern aside and focus exclusively on the issue of Strickland prejudice.

-6-

the trial would have been different had the jury heard specific testimony of a specific witness.

The Supreme Court of Arkansas affirmed, holding that Williams established neither deficient performance nor prejudice under Strickland. Williams v. State, 64 S.W.3d 709 (Ark. 2002) (Williams II). One Justice concurred solely on the no-prejudice ground. The Court observed that, unlike Williams, successful post-conviction petitioners in Supreme Court of Arkansas and United States Supreme Court cases had "offered factual substantiation of such a substantial amount of omitted mitigating evidence that the Court was convinced that there was a reasonable probability that the evidence could have changed the result of the sentencing phase." Id. at 715-16, citing Williams v. Taylor, 529 U.S. 362 (2000) (Terry Williams), and Sanford v. State, 25 S.W.3d 414 (Ark. 2000).

**C. The Federal Habeas Proceedings.** Williams timely filed a federal habeas corpus petition. His amended petition raised numerous claims, including an ineffective assistance claim based on counsel's failure to develop and present during the penalty phase mitigating social history evidence through testimony by an expert such as a psychiatrist, a psychologist, or a social worker. In October 2004, appointed counsel filed a Motion for Additional Time to File an Amended Petition and Conduct an Extensive Social History Investigation, detailing the investigation counsel would conduct and requesting, without supporting legal argument, an evidentiary hearing. The State objected, arguing that a federal habeas proceeding is not an opportunity to retry the case and that, "this Court has before it ample information to determine [the ineffective assistance question]." The district court granted the motion, noting it would "conduct an evidentiary hearing, if one is necessary," without further explanation. Williams filed his amended petition in April 2005. In June 2006, the court issued an order that the Supreme Court of Arkansas made "an unreasonable determination" that trial counsel did not perform deficiently at the penalty phase. See 28 U.S.C. § 2254(d)(2). Citing Rule 8(a) of the Rules Governing Section 2254 Cases,

the court ordered an evidentiary hearing on the issue of <u>Strickland</u> prejudice in December 2006.

At the evidentiary hearing, Williams presented mitigating evidence he contends counsel should have introduced during the penalty phase. The cornerstone of this evidence was testimony by Dr. David Lisak, a psychologist who recounted Williams's social history based on interviews with Williams, his mother, half-sister Peggy O'Neal, and a cousin, and reviews of Williams's medical, training school, and prison records. O'Neal, four cousins, and a training school counselor also testified.

Lisak testified that Williams had been "exposed to pretty much every category of traumatic experience that is generally used to describe childhood trauma," including physical, sexual, and psychological abuse, and neglect. According to Lisak, Sara Riggs and Williams's stepfather, James Riggs, often beat Williams, and Sara intentionally burned him twice. Sara "pimped [Williams] to older women from the age of ten on," and two of her many male companions sexually molested him. Sara and James fought in front of the children, and neither was affectionate toward Williams. Sara abused alcohol and would leave the children home alone for days at a time while partying. The cousins described Williams's family homes as roach-infested and "nasty," in neighborhoods riddled with drug activity and violence. Living in poverty and neglect, Williams began stealing and shoplifting to support his siblings. Lisak testified that Williams was sent to two training schools between the ages of twelve and fourteen for theft-related offenses. He resumed stealing shortly after his release and was convicted of aggravated robbery as an adult in 1986, when he was sixteen. He was sentenced to eight years in prison, where he allegedly was raped by three fellow inmates.

Lisak opined that the abuse and neglect Williams suffered can cause a young person to develop accentuated impulses and inhibit his ability to control the impulses in response to stimuli. He further opined that Williams had exhibited symptoms of

post-traumatic stress disorder for some time. Lisak opined that a person with his qualifications and experience could have provided similar testimony at the penalty phase. Peggy O'Neal and Williams's cousins testified that they would have testified at his trial if asked. Sara Riggs again did not testify.

Based on this evidence, the district court granted the relief on the ineffective assistance claim. On the Strickland prejudice issue, the court concluded:

> The evidence here is as compelling as the evidence in Wiggins [v. Smith, 539 U.S. 510 (2003)], where the Supreme Court granted a petition for writ of habeas corpus pursuant to the standards of . . . 28 U.S.C. § 2254 . . . . Likewise, the evidence here is as compelling as the evidence in Simmons v. Luebbers, 299 F.3d 929 (8th Cir. 2002)[, cert. denied, 538 U.S. 923 (2003)], where the court also granted a petition for writ of habeas corpus, finding that the lawyers . . . in a capital case were ineffective for failing to present at the penalty phase evidence that the defendant had been abused and neglected during his childhood.

The court denied Williams's other claims, set aside the death sentence, and ordered the State to afford Williams a new penalty phase trial or change his penalty to life in prison without parole. The court stayed its order pending these appeals.

The State appeals the ineffective assistance ruling. In his cross-appeal, Williams argues that the prosecutor exercised peremptory strikes in a racially discriminatory manner; that the denial of a for-cause challenge abridged his constitutional right to a fair and impartial jury; that his in-custody statement was unconstitutionally admitted; that Arkansas' capital murder and death penalty statutes are unconstitutional; that premising an aggravating circumstance on juvenile conduct violates Roper v. Simmons, 543 U.S. 551 (2005); that the pecuniary gain aggravating circumstance constituted unconstitutional "double counting"; and that the "cruel, depraved, or indifferent" aggravating circumstance was unconstitutionally vague and supported by insufficient evidence.

## II. Ineffective Assistance of Counsel

To obtain relief based on ineffective assistance of trial counsel, Williams must establish that counsel's performance fell below an objective standard of reasonableness and that this deficient performance prejudiced his defense. Strickland, 466 U.S. at 687. Although the Supreme Court of Arkansas considered both deficient performance and prejudice, we need address only its prejudice ruling. See id. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. When the claim is that additional mitigating evidence should have been presented at the penalty phase, petitioner must show "a reasonable probability that at least one of the jurors would have voted against the imposition of the death penalty." Simmons v. Luebbers, 299 F.3d at 939.

Because the state courts ruled on the merits of this claim, we must apply the deferential standards for reviewing state court determinations mandated by AEDPA. See Helmig v. Kemna, 461 F.3d 960, 966 (8th Cir. 2006). Therefore, Williams must demonstrate that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence" presented in state court. 28 U.S.C. § 2254(d)(1), (2). Findings of fact by the state trial and appellate courts are presumed correct unless rebutted by "clear and convincing evidence." § 2254(e)(1).

1. In holding that Williams failed to prove Strickland prejudice, the Supreme Court of Arkansas explained: "We will not grant postconviction relief for ineffective assistance of counsel where the petitioner failed to show what the omitted testimony

was and how it could have changed the outcome." 64 S.W.3d at 716.[2] The Court carefully distinguished the state post-conviction record in Terry Williams, 529 U.S. at 370-71, concluding that in that case, the petitioner factually substantiated that the omitted evidence would likely have changed the result of the penalty phase. Here, on the other hand, Williams "failed to call anyone to the stand at his Rule 37 hearing or to proffer the substance of any specific testimony to show what evidence could have been presented and whether it would have changed the mind of one of the jurors." 64 S.W.3d at 716.

We conclude that this no-prejudice ruling, *based on the state post-conviction record*, was not contrary to nor an unreasonable application of Strickland. Williams virtually concedes the point, arguing only that the district court was correct in ruling that the evidence presented at the *federal* evidentiary hearing makes this case indistinguishable from Wiggins and Simmons. But those cases, like Terry Williams, were decided by reviewing[3] *state* post-conviction records that included detailed explanation and substantiation of what omitted mitigating evidence could have been presented and its probable impact on the penalty phase jury, precisely the evidence the Supreme Court of Arkansas found lacking here. In other words, the district court granted habeas relief on an evidentiary record never presented to the state courts. The critical question is whether the district court erred by proceeding in that manner.

---

[2]The Court has relied on this principle in denying ineffective assistance claims in numerous cases. See Noel v. State, 26 S.W.3d 123, 126 (Ark. 2000); Pyle v. State, 8 S.W.3d 491, 499 (Ark. 2000); Johnson v. State, 900 S.W.2d 940, 946-47 (Ark. 1995); Fretwell v. State, 728 S.W.2d 180, 183 (Ark. 1987), quoted in Fretwell v. Norris, 133 F.3d 621, 622 (8th Cir.), cert. denied, 525 U.S. 846 (1998); Gilbert v. State, 669 S.W.2d 454, 456 (Ark. 1984).

[3]The Maryland Court of Appeals did not rule on prejudice in Wiggins, so the Supreme Court reviewed the prejudice issue *de novo*, unconstrained, as we are, by the deferential AEDPA standard of review. See 539 U.S. at 534.

2.   Codifying the standard of diligence adopted by the Supreme Court in Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992), AEDPA enacted mandatory restrictions barring evidentiary hearings in most federal habeas proceedings:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court *shall not* hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).  Only if the habeas petitioner "was unable to develop his claim in state court despite diligent effort" is an evidentiary hearing not barred by § 2254(e)(2).  Williams v. Taylor, 529 U.S. 420, 437 (2000) (Michael Williams).  In that case, "the decision to grant such a hearing rests in the discretion of the district court."  Schriro v. Landrigan, 127 S. Ct. 1933, 1937 (2007).

Here, Williams requested an evidentiary hearing without citing § 2254(e)(2) or attempting to satisfy its mandatory restrictions.  The district court granted the hearing without reference to § 2254(e)(2), citing only Rule 8(a) of the Rules Governing

-12-

Section 2254 Cases.[4]  This was reversible error.  <u>Bradshaw v. Richey</u>,  546 U.S. 74, 79 (2005) (per curiam); <u>Holland v. Jackson</u>, 542 U.S. 649, 652-53 (2004) (per curiam).

Williams argues that the State never objected to an evidentiary hearing and thus waived § 2254(e)(2)'s restrictions, a contention the Supreme Court summarily rejected in <u>Holland</u>, 542 U.S. at 653 n.1.  We disagree.  The State's Objections to Williams's motion for additional time and an evidentiary hearing argued that, under AEDPA, "the [federal] court is prevented from re-trying a state criminal case."  That incorporated the fundamental purpose behind the restrictions on evidentiary hearings in § 2254(e)(2) and in the judicial doctrines it codified.  <u>See Michael Williams</u>, 529 U.S. at 436-37; <u>Keeney</u>, 504 U.S. at 8-9.

Even if the State had not objected, we would exercise our discretion to review the district court's non-compliance with § 2254(e)(2).  <u>See King v. Kemna</u>, 266 F.3d 816, 821-22 (8th Cir. 2001) (en banc), <u>cert. denied</u>, 535 U.S. 934 (2002); <u>see generally</u> <u>Day v. McDonough</u>, 547 U.S. 198 (2006).  Interests of comity, federalism, and the administration of justice dictate that, "when a prisoner alleges that his [punishment] for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." <u>Michael Williams</u>, 529 U.S. at 437 (quotation omitted).  In this case, where the issue is whether the omitted mitigating evidence presented at the evidentiary hearing established that Williams was prejudiced by trial counsel's deficient performance at the penalty phase, there are strong reasons for enforcing those policies.

First, a threshold question, unexplored by the district court, is whether Dr. Lisak's testimony would have been admissible at the penalty phase without other

---

[4]The Advisory Committee Notes to the 2004 amendment to Rule 8 expressly state, "Rule 8(a) is not intended to supersede the restrictions on evidentiary hearings contained in 28 U.S.C. § 2254(e)(2)."

witnesses providing factual foundation for his opinions. In an Arkansas capital case, "[e]vidence as to any mitigating circumstance may be presented by either the state or the defendant regardless of the evidence's admissibility under the rules governing admission of evidence in a trial of a criminal matter." Ark. Code Ann. § 5-4-602(4)(B)(i). But "this statute was not designed to create a vehicle for intentional circumvention of the rules of evidence." Hill v. State, 628 S.W.2d 284, 291 (Ark. 1982) (excluding hearsay when declarant was available). Numerous reported cases confirm that, by the time of Williams's trial, expert testimony presenting the defendant's social history as mitigating evidence at the penalty phase of Arkansas capital cases was not uncommon.[5] But in these cases other witnesses, usually the defendant, also testified and provided factual foundation for the experts' opinions. The state trial court in a Rule 37 evidentiary proceeding is best positioned to consider this question.

Second, if other witnesses were needed to provide a factual basis for Dr. Lisak's social history and expert opinions, who would those witnesses have been? Williams was obviously the source for much of Lisak's testimony. But it is undisputed that trial counsel's decision not to have Williams testify was reasonable. Williams's mother, Sara Riggs, was another source. But Riggs was uncooperative with trial counsel and did not testify at either post-conviction hearing. Lisak interviewed her and then testified she was guilty of pervasive parental abuse that she refused to admit. Would that testimony be admissible and, if so, credible? The other family members who testified at the evidentiary hearing -- Peggy O'Neal and four cousins -- did not have first-hand knowledge of the pervasive home abuse to which Lisak testified. Moreover, discrepancies between Lisak's and Peggy's accounts of Williams's

_____

[5]See Ruiz v. State, 772 S.W.2d 297, 306 (Ark. 1989) (psychologist testified at trial); Johnson v. State, 823 S.W.2d 800, 810 (Ark. 1992) (error to exclude); Echols v. State, 127 S.W.3d 486, 506-07 (Ark. 2003) (psychologist testified at pre-1996 trial); Rankin v. State, 227 S.W.3d 924, 928 (Ark. 2006) (psychologist testified at 1996 trial); Fretwell, 133 F.3d 621, 623 (psychologist testified at 1985 trial).

childhood -- Lisak testified that Sara abused Williams, but Peggy portrayed her mother's "whoopings" as discipline -- would weaken Lisak's testimony, despite Lisak's unsubstantiated dismissal of these discrepancies as Peggy "minimizing what was going on in the home."

Third, Hendry and Wright testified at the Rule 37 hearing that they contacted any family members Williams told them might be of assistance. There is no evidence Williams told them about the cousins who testified at the federal hearing, and it is undisputed that counsel did not contact Peggy O'Neal because Williams told them he and Peggy had lost contact for many years. If counsel's failure to seek them out was not constitutionally defective, see Fretwell, 133 F.3d at 627, should their post-conviction testimony be factored into the prejudice inquiry?

Fourth, even if Lisak's testimony and opinions were admissible without corroboration, if Williams would not or should not testify to substantiate the claimed mitigating social history, does the claim raise a reasonable probability of a different outcome in the face of the State's powerful case of aggravating circumstances? The historical records on which Lisak relied contained much damaging evidence, unlike the record in Wiggins, 539 U.S. at 537. For example, Williams's prison records listed some sixty disciplinary violations, several violent, and described Williams as "manipulative." While Lisak portrayed Williams's juvenile offenses as attempts to provide basic necessities for the family, a training school evaluator wrote that Williams's "only reason for involvement in acts of Theft is the excitement of getting away with it." Compare Echols v. State, 936 S.W.2d 509, 520-21 (Ark. 1996) (describing cross-examination of social history expert on damaging information in the defendant's medical records). Arkansas juries have imposed the death penalty even after finding the defendant's dysfunctional past a mitigating circumstance. See Coulter v. State, 31 S.W.3d 826, 831-32 (Ark. 2000).

Unless Williams was foreclosed from developing a full factual record in the Rule 37 proceedings, these are questions that should be presented to and answered by the state courts. "The state court is the appropriate forum for resolution of factual issues in the first instance, and . . . the deferral of factfinding to later federal-court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Keeney, 504 U.S. at 9.

3. We further conclude that the state court record establishes, as a matter of law, that Williams "failed to develop the factual basis of [this] claim in State court proceedings," as § 2254(e)(2) was construed and applied by the Supreme Court in Michael Williams, 529 U.S. at 432 (failure to develop means "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"). Indeed, Williams does not argue to the contrary. When he filed his Rule 37 petition for post-conviction relief, the trial court promptly appointed experienced, well-qualified counsel and ordered an evidentiary hearing. The hearing record reveals no state court ruling or other state-created impediment that prevented Williams from developing the factual basis for his ineffective assistance of counsel claim. As the Supreme Court of Arkansas observed in denying post-conviction relief, Williams and his counsel were responsible for the lack of evidence establishing and substantiating Strickland prejudice. "Attorney negligence . . . is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied." Holland, 542 U.S. at 653; see Gingras v. Weber 543 F.3d 1001, 1004 (8th Cir. 2008).

Because Williams failed to develop in the state proceedings the facts he sought to develop in the district court, that court "was barred from granting an evidentiary hearing absent [Williams's] compliance with the balance of § 2254(e)(2)'s stringent requirements." Osborne v. Purkett, 411 F.3d 911, 916 (8th Cir. 2005), cert. denied, 547 U.S. 1022 (2006). Here, as in Koste v. Dormire, Williams has not argued that either exception in § 2254(e)(2)(A) and (B) applies, and it is apparent that neither does. 345 F.3d 974, 986 (8th Cir. 2003), cert. denied, 541 U.S. 1011 (2004).

Strickland was a well-established rule of constitutional law, available at the time of Williams's trial and post-conviction proceedings. The historical facts that Williams claims counsel should have developed and presented were, by definition, discoverable at the time of the state court proceedings by reviewing prison and mental health records, interviewing family members, and so forth. Attorney McLean was aware that trial counsel could have presented testimony by a social history expert at the penalty phase, and that he could have presented such testimony at the Rule 37 hearing to establish prejudicial ineffective assistance, as evidenced by McLean's examination of trial counsel at the Rule 37 hearing and by the cases cited in note 5, supra.

The district court erred in granting an evidentiary hearing when the mandatory restrictions in 28 U.S.C. § 2254(e)(2) barred a hearing. Accordingly, we must decline to consider the evidence presented at that hearing and review, under AEDPA standards, the state court determination that Williams failed to prove Strickland prejudice on the factual record he developed in state court. On that record, the state court decision was neither contrary to nor an unreasonable application of Strickland. Accordingly, habeas relief on this claim must be denied. See Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002), cert. denied, 540 U.S. 893 (2003).

### III. Batson Challenges

On cross-appeal, Williams first argues that the State's use of peremptory strikes to remove three prospective African American jurors violated Batson v. Kentucky, 476 U.S. 79, 85, 95-96 (1986). Batson mandates a three-step inquiry -- did the defendant make a prima facie showing that a strike was racially motivated; if so, did the prosecutor provide a race-neutral reason for the strike; and if so, did the defendant prove purposeful discrimination by showing that the proffered reason was pretextual or unpersuasive. Smulls v. Roper, 535 F.3d 853, 859 (8th Cir. 2008) (en banc), cert. denied, 129 S. Ct. 1905 (2009). The state courts, applying Batson, decided these fact-intensive issues on the merits. Therefore, Williams must establish that the state court

rulings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In resolving this issue, we presume state court fact finding is correct unless Williams presents clear and convincing evidence to the contrary. See id. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231, 240 (2005); Weaver v. Bowersox, 241 F.3d 1024, 1029-31 (8th Cir. 2001).

At trial, after preliminary screening, thirty-three members of the venire panel were available to be seated, twenty-five whites and eight African Americans. The State used seven of its eleven peremptory strikes, striking four African Americans and three whites. The defense used its thirteen strikes to strike twelve whites and one African American. Three of the twelve jurors selected were African Americans, and an African American alternate replaced a white juror who became ill at the start of trial. Thus, four of the twelve jurors who convicted and sentenced Williams were African Americans.

**A. Prospective Juror Artis.** Williams challenged each peremptory strike of an African American. The first was prospective juror Shirley Artis, struck by the prosecutor after another African American had been seated. The trial judge asked the State's reasons for the strike. The prosecutor responded that Artis had only a high school education, and the State wanted to "get the best educated jurors that we can" because it planned to introduce complex DNA evidence. The judge reserved ruling to see if a pattern developed and then denied the Batson challenge to Artis just before the last juror was seated. The court found (i) Williams had not established a prima facie case based on the race of the eleven jurors then seated, which included three African Americans, and (ii) the State had proffered a race-neutral reason.

On direct appeal, Williams challenged the strike of juror Artis. The Supreme Court of Arkansas affirmed the trial judge's finding that the State offered a race-neutral explanation for the strike. See Williams I, 991 S.W.2d at 572-73. The district

court in a lengthy discussion of all juror selection issues agreed, concluding "there is evidence from which the Arkansas courts could reasonably find that the prosecutor did not engage in purposeful racial discrimination in the selection of the jury," and the decision upholding the strike of juror Artis "is a reasonable decision based on the record." Applying the deferential standard of review mandated by AEDPA, the court denied habeas relief.

On appeal, Williams argues that the prosecutor's proffered reason for striking Artis was clearly pretextual because the State accepted Brenda Sherrill, a white woman who also had a high school education, and seven other white jurors who had a high school education or less. Striking a black panelist for reasons that apply as well to similar nonblacks who serve "is evidence tending to prove purposeful discrimination." Dretke, 545 U.S. at 241; see Nicklasson v. Roper, 491 F.3d 830, 842 (8th Cir. 2007), cert. denied, 128 S. Ct. 2052 (2008). But here, the argument misconstrues the trial record. After the trial judge deferred ruling on the Artis challenge, the State did not strike juror Sherrill. The trial judge commented, *sua sponte*, "I also want to show that Ms. Sherrill has a high school education and was accepted by the State. I think that ought to be part of the record." The prosecutor then elaborated on the strike of Artis:

> She did not appear to me to be bright when I was talking to her. She also was a shipping clerk for Maybelline. All of these things worried me in conjunction with DNA. Ms. Sherrill appeared to be articulate. She's also a manager of a store. I felt like that . . . boded well for the DNA -- understanding the DNA evidence.

In denying the challenge to this strike, the trial judge explained:

> I think the high school [education] was probably [an] inappropriate way to say it, but I think [the State] felt that from her responses and her background that perhaps she wasn't the person they wanted because of her ability to understand the evidence in this case.

Thus, ability to understand DNA evidence, not education level, was the race-neutral reason for striking juror Artis, as understood by the trial judge. The Supreme Court of Arkansas agreed with this finding, upholding the strike of Artis because it was "made to obtain a jury capable of understanding the complex evidence, particularly, DNA evidence." Williams I, 991 S.W.2d at 572.

Ability to understand complex evidence, like intelligence, is a factor "that can be appraised by the trial judge who questioned those jurors during voir dire (or who watched them being questioned by counsel)." Olson v. Ford Motor Co., 481 F.3d 619, 623 (8th Cir. 2007); see Smulls, 535 F.3d at 859. Prior to AEDPA, the Supreme Court held that such evaluations lie "peculiarly within a trial judge's province" and must be accorded deference "in the absence of exceptional circumstances." Hernandez v. N.Y., 500 U.S. 352, 365-66 (1991) (quotation omitted).

Williams further argues the trial judge erred because he "believed that [he] could consider only the record at the time the juror was struck for purposes of determining whether the defense had made a prima facie showing." This contention is without merit. The judge deferred ruling on juror Artis until nearly all jurors had been seated, and demonstrated that he in fact considered later evidence by referring to the African American juror he reseated after upholding a later Batson challenge, and by taking into account the prosecutor's additional explanation of the reasons for the strike. In finding that Williams did not make a prima facie showing of discrimination, the trial judge was entitled to accord weight to the seating of nearly half of the eligible African American jurors, as compared to about twenty percent of the eligible white jurors. See Weaver, 241 F.3d at 1030. We agree with the district court that Williams failed to overcome the presumption of correctness we must accord the trial judge's finding of no prima facie showing. See 28 U.S.C. § 2254(e)(1).

Williams further argues that the trial court's fact-finding was tainted by the judge's "resistan[ce] to the requirements of <u>Batson</u> from the start." This contention, too, is without merit. As the district court noted, "the trial judge expressed some frustration with the lack of guidance from the Supreme Court as to how to implement <u>Batson</u>," but the judge "agreed with the central holding of <u>Batson</u>" and applied it. The comments in question were made in the course of *sustaining* a <u>Batson</u> challenge. This is not an exceptional circumstance rebutting the state courts' finding that the strike of Artis was not based on race.

**B. Other Challenges.** After the third African American panel member was seated, the State struck the fourth and fifth, Columbus Strain and Lou Chandler. The court overruled <u>Batson</u> challenges. The court upheld the <u>Batson</u> challenge to the State's strike of the sixth African American, and she was seated. Williams struck the seventh. The eighth was seated as an alternate and ultimately served. On direct appeal, Williams challenged the State's use of peremptory strikes generally, but not the strikes of Strain and Chandler specifically. The Supreme Court of Arkansas affirmed the trial judge's rulings. <u>Williams I</u>, 991 S.W.2d at 571-73. The district court held that specific challenges to the strikes of jurors Strain and Chandler were procedurally defaulted because not raised on appeal, and that the Arkansas courts reasonably found no purposeful racial discrimination in the selection of the jury.

Arkansas Supreme Court Rule 4-3(h)[6] mandates Supreme Court review of "all errors prejudicial to the appellant." Williams argues that this rule "overcomes procedural bar as to those errors preserved in [the trial court] record," citing <u>Starr v. Lockhart</u>, 23 F.3d 1280, 1287 (8th Cir.), <u>cert. denied</u>, 513 U.S. 995 (1994). But our decision in <u>Starr</u>, at least as broadly construed by Williams, was overruled by AEDPA as applied in <u>Baldwin v. Reese</u>, 541 U.S. 27 (2004). <u>See also</u> <u>Bell v. Cone</u>, 543 U.S. 447, 451 n.3 (2005). On direct appeal, Williams challenged the strike of Artis

---

[6]Recodified without substantive change as Ark. Sup. Ct. R. 4-3(i).

specifically and the State's strike of four African Americans generally. The Supreme Court of Arkansas addressed in detail only those issues. Other issues relating to the strikes of Strain and Chandler were not "fairly presented" to the state appellate court, and therefore Williams did not exhaust available state remedies. Baldwin, 541 U.S. at 29, applying 28 U.S.C. § 2254(b)(1). The district court properly held those issues procedurally barred.

The district court went on to consider whether the strikes of prospective jurors Strain and Chandler cast doubt on the Supreme Court of Arkansas' finding that the State was not guilty of purposeful race discrimination in selecting the jury. During voir dire, Strain said he recognized Williams. When asked whether this would affect his ability to impose the death penalty, Strain responded, "It might. It might. I'm being honest about it." At another point he stated, "I really don't believe in the death penalty." The prosecutor gave as reasons for striking Strain: "he thought he recognized the Defendant and that he might have a problem putting his name on the death penalty form." During voir dire, prospective juror Chandler said that her son had been convicted of a drug charge but she believed the criminal justice system was fair. Chandler said she could think of circumstances in which the death penalty would be appropriate, and would follow the law as the judge explained it. But when asked if any "religious, moral or ethical beliefs" affected her view of the death penalty, she responded, "As far as my religious belief, I don't believe in capital punishment." The prosecutor gave as reasons for striking Chandler: "that her son had had a prior drug conviction [and] religiously she was against the death penalty."

Williams argues the State did not strike white jurors who expressed mixed views on the death penalty like Strain. But no juror was similarly situated to Strain, who recognized Williams and acknowledged that this might affect his ability to

-22-

impose the death penalty.[7] Likewise, the proffered reasons for striking Chandler -- her son had a prior drug conviction, and she was religiously opposed to the death penalty -- withstand pretext scrutiny.[8] We agree with the district court that Williams neither rebutted the trial court's findings of no purposeful discrimination by clear and convincing evidence nor proved that the state courts' disposition of the <u>Batson</u> claims was unreasonable. <u>See</u> 28 U.S.C. §§ 2254(d)(2), (e)(1). "A federal court can only grant habeas relief if the state court's credibility determinations were objectively unreasonable." <u>Smulls</u>, 535 F.3d at 864.

## IV. Denial of a Strike for Cause

During jury selection, the trial court denied Williams's motion to strike juror Kay Barfield for cause based on her attitudes toward the death penalty. Williams did not exercise one of his remaining peremptory challenges, commenting "she was good for the defense." After the final juror was seated, Williams renewed motions for cause regarding three jurors against whom he *had* exercised peremptory strikes, but he did not renew his motion regarding Barfield, and she served on the jury. Williams raised the denial of his motions to strike the other three on direct appeal; it is not clear whether he challenged the seating of Barfield.[9] The Supreme Court of Arkansas held,

---

[7]Our en banc decision in <u>Smulls</u>, 535 F.3d at 860, rejected Williams's additional contention that the trial judge failed to make specific findings to support his determination that the strike of Strain was not racially discriminatory.

[8]Andrea Seaman, a white prospective juror, said she was raised a Catholic and would be "real iffy" about imposing a death sentence. The State struck Seaman as well as Chandler.

[9]The Supreme Court of Arkansas referred to its rule that an appellant must be forced to accept a juror because peremptory strikes have been exhausted in order to preserve a claim that a juror should have been struck for cause. <u>See</u> <u>Patterson v. State</u>, 885 S.W.2d 667, 669 (Ark. 1994).

"Williams did not show he was forced to accept a juror who should have been excused for cause." Williams I, 991 S.W.2d at 573.

On appeal, Williams argues that refusing to strike juror Barfield for cause violated his right to a fair and impartial jury in a capital case. See Morgan v. Illinois, 504 U.S. 719, 726-28 (1992). Although it appears this issue was procedurally barred in the state courts, the district court reviewed the voir dire of Barfield at length and concluded that Williams failed to show that Barfield should have been excused for cause. After careful review of the record, we agree. The issue was whether Barfield's views would "prevent or substantially impair" performance of her duties as a juror, an issue on which "deference must be paid to the trial judge who sees and hears the juror." Wainwright v. Witt, 469 U.S. 412, 424-25 (1985) (quotation omitted). Williams failed to show by clear and convincing evidence that the trial court's finding of no actual bias was constitutionally infirm.

## V. Admission of the Inculpatory Statement

Williams argues that his partially inculpatory custodial statement should not have been admitted during the guilt phase because his waiver of Miranda rights was invalid and the statement was involuntary. The district court rejected these claims, concluding that the state courts' conclusions did not involve an unreasonable application of Colorado v. Spring, 479 U.S. 564, 575-76 (1987). We agree.

At the North Little Rock police station following Williams's arrest, Detective Dan Cook and Sergeant Kenny Boyd presented Williams with a Miranda waiver form titled "Statement of Rights." Cook explained the form, read Williams each right, and told him he would be questioned about "kidnapping." Williams initialed and signed the form, stating "I've been through this." He also recorded his education level: "GED. 1½ semester college -- read & write." Without naming the victim, Cook then questioned Williams about the abduction of "a girl" that involved forced ATM

-24-

withdrawals. Williams said he knew they wanted him to talk about an abduction that's "been all over the news" and began telling a story about the abduction of Errickson, which he later changed several times and which ultimately proved to be false. The officers then mentioned Errickson by name and continued questioning Williams about her disappearance, attempting to learn her whereabouts from Williams, who maintained she was still alive.

The police questioned Williams from 4:22 p.m. on November 29 until nearly 6:00 the next morning. Between 7:15 and 9:15 p.m., Williams and three officers drove around Little Rock trying to locate a house where Williams said they would find Errickson. The rest of the videotaped interview was conducted in an eight-by-ten-foot room by four officers, only two of whom questioned Williams at any given time. The officers allowed Williams ten-to-thirty-minute bathroom breaks and provided him with food, water, and cigarettes. His request to speak with Sergeant Boyd, whom he knew from a previous arrest, was granted.

Early in the interview, Williams asked about "the chance of gettin' some help from the [prosecutor] if I can help you find that girl that's missing." Detective Mike Jeu replied, "I will go to the prosecutor myself, and tell the prosecutor that you fully cooperated and you assisted us in finding this girl, and that you realize that you made a mistake." Jeu later added, "you know . . . the more cooperative you are, the prosecutor takes that into consideration." Still later, Jeu said Williams would be better off if he disclosed Errickson's location; "you know the prosecutor's not going to stick their necks out and say, 'Yeah, he fully cooperated, but we still hadn't found Stacy.'" Jeu knew that the prosecutor was watching the interview from another room.

The officers also urged Williams to give Errickson's family the "opportunity for a Christian burial" and posited that her body had been laying out in the cold with "animals eat[ing] on her." The officers quoted the Bible in urging Williams to come clean and appealed to his concern for his ill mother. Williams never confessed to

killing Errickson but did confess to kidnapping her and robbing her through ATM withdrawals. The prosecution introduced portions of the statement at trial as substantive evidence of Williams's commission of kidnapping and robbery, and as evidence of fabrication concerning the murder and rape charges.

**A. Validity of Miranda Waiver.** To be valid, a waiver of the rights protected by Miranda must be voluntary, knowing, and intelligent. 384 U.S. at 444. Williams argues his waiver was neither knowing nor intelligent because he understood he would be questioned about one kidnapping, but the police in fact questioned him about a separate kidnapping and murder. The Supreme Court of Arkansas affirmed the trial court's findings that Williams "understood he was voluntarily giving up substantial rights and . . . understood the potential consequences." Williams I, 991 S.W.2d at 573. We agree with the district court that this was not an unreasonable application of Spring. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Spring, 479 U.S. at 574. When Detective Cook said the subject of the interview was a "kidnapping," Williams himself first raised the subject of Errickson's disappearance. There was no "affirmative misrepresentation . . . as to the scope of the interrogation," an issue the Supreme Court left open in Spring, 479 U.S. at 576 n.8.

**B. Voluntariness.** An inculpatory statement is inadmissible if the defendant proves that his "will was overborne and [his] capacity for self-determination critically impaired" by coercive police activity. Jenner v. Smith, 982 F.2d 329, 333 (8th Cir.) (quotation omitted), cert. denied, 510 U.S. 822 (1993). But it is a rare case when a defendant "can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir.) (quotation omitted), cert. denied, 534 U.S. 924 (2001).

-26-

Williams argues that he was subjected to a variety of coercive practices -- "marathon interrogation" by a team of officers at night in a cramped room; appeal to divine authority and to sympathy for Errickson's family and Williams's ill mother; and Detective Jeu's promises of leniency. In rejecting this claim, the Supreme Court of Arkansas found "no false promise of leniency" because Jeu's statements were not promises of leniency, nor did Williams interpret them as such, and "no impermissible coercion." Williams I, 991 S.W.2d at 574. The district court held that this was not an unreasonable interpretation of the Supreme Court's voluntariness precedents. After careful review of the record, we agree.

Though lengthy interrogation, appeals to God and family, and promises of leniency can be coercive, the question is whether the totality of the circumstances demonstrate that Williams's will was overborne by coercion. Here, there is no evidence of such an effect on Williams. Questioning a suspect for thirteen hours is not unconstitutional per se, particularly when a crime victim has disappeared and may still be alive. Williams received a two-hour respite during the car trip, several breaks, and food, water, and cigarettes. He was relatively well educated and experienced with the criminal justice system. He spoke rationally and articulately throughout the interview, repeatedly acknowledging responsibility for his conduct, pledging to plead guilty to any charges, and stating, "I'm not expecting a slap on the wrist for this. I've already prepared myself from a mental standpoint . . . ." Williams himself initiated the question of leniency; after Jeu's final offer, Williams said, "You didn't put me in this situation. I did . . . . [S]omehow I gotta walk alone."[10] These are not the words of a suspect with an overborne will or an impaired capacity for self-determination. See Smith v. Bowersox, 311 F.3d at 922-23; Simmons v. Bowersox, 235 F.3d at 1132-33. The Supreme Court of Arkansas' voluntariness ruling was reasonable. See 28 U.S.C. § 2254(d)(1).

---

[10]Telling a suspect it "would be better for him" to tell the truth is not a promise of leniency. Bolder v. Armontrout, 921 F.2d 1359, 1366 (8th Cir. 1990), cert. denied, 502 U.S. 850 (1991).

# VI. Constitutionality of Arkansas Statutes

**A. Capital and First-Degree Murder Statutes.** At the conclusion of the guilt phase of the trial, the trial court instructed the jury on the elements of capital murder and first-degree murder, which were substantively identical in this case because the underlying felony for both offenses was kidnapping. See Ark. Code Ann. §§ 5-10-101(a)(1), 5-10-102(a)(1). Williams argues this overlap violated due process because it risked arbitrary decisionmaking in a capital case. The state courts summarily rejected this claim. We agree with the district court that the claim is foreclosed by our prior decision in Simpson v. Lockhart, 942 F.2d 493, 496-97 (8th Cir. 1991), which we are not at liberty to revisit.

**B. Death Penalty Statutory Framework.** At the penalty phase, the jury was instructed consistently with Ark. Code Ann. § 5-4-603, which provides:

> (a) The jury shall impose a sentence of death if the jury unanimously returns written findings that:
>
>   (1) An aggravating circumstance exists beyond a reasonable doubt;
>
>   (2) Aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist; and
>
>   (3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

Williams argues this sentencing regime is facially unconstitutional because it does not permit the jury to give adequate effect to mitigating evidence. The state courts and the district court summarily rejected this contention. The contention is foreclosed by our prior decision in Singleton v. Lockhart, 962 F.2d 1315, 1323 (8th Cir.), cert. denied, 506 U.S. 964 (1992). Williams argues that Singleton was "abrogated" by the Supreme Court's later decisions in Smith v. Texas, 543 U.S. 37 (2004), and Tennard

-28-

v. Dretke, 542 U.S. 274 (2004). We disagree. Those cases involved a mandatory "nullification instruction" used in applying a different Texas statute. See Smith v. Texas, 543 U.S. at 46-48. In both decisions, the Supreme Court cited favorably to Boyde v. California, 494 U.S. 370 (1990), on which we relied in Singleton.

## VII.  Aggravating Factor Issues

**A. Use of a Prior Felony Committed as a Juvenile.**  The jury found as an aggravating circumstance that Williams had committed a prior violent felony. See Ark. Code Ann. § 5-4-604(3). One of the prior felonies the State urged in support of this factor was a prior conviction for a robbery Williams committed when he was fifteen years old. Relying on the Supreme Court's decision in Roper v. Simmons, 543 U.S. 551 (2005), that the execution of a sixteen-year-old is unconstitutional, Williams argues that use of this conviction as an aggravating circumstance violated the Eighth and Fourteenth Amendments.

As this claim was not presented to the state courts, the district court properly denied it as procedurally barred. Williams urges us to remand for a determination whether cause and prejudice excuse his procedural default, asserting that he can establish cause because Roper was not decided until after his state postconviction proceedings. Putting aside the obvious difference between executing a juvenile and considering conduct as a juvenile in determining whether an adult warrants the death penalty, cf. United States v. Jones, No. 08-2851, 2009 WL 2194820, at *5 (8th Cir. July 24, 2009), we conclude the contention that cause excuses his default is without merit. In 1988, years before Williams's criminal trial, a plurality of the Supreme Court wrote that execution of a fifteen-year-old would violate the Eighth Amendment. Thompson v. Oklahoma, 487 U.S. 815, 838 (1988). Thus, the argument Williams belatedly seeks to raise was not "so novel that its legal basis [was] not reasonably available" to him in state court. See Reed v. Ross, 468 U.S. 1, 16 (1984).

**B. The Pecuniary Gain Aggravator.** Williams argues that this statutory aggravating factor unconstitutionally fails to narrow the class of death-eligible offenders because it merely duplicates an element of the underlying crime of felony murder during the course of a robbery. He asserts that Collins v. Lockhart, 754 F.2d 258, 264 (8th Cir. 1985), was correctly decided and improperly overruled by Perry v. Lockhart, 871 F.2d 1384 (8th Cir.), cert. denied, 493 U.S. 959 (1989), a question the Supreme Court noted but did not decide in Lockhart v. Fretwell, 506 U.S. 364, 371 n.4 (1993). As the district court correctly concluded, this argument is foreclosed by later decisions of this court, if not by Perry. See Wainwright v. Lockhart, 80 F.3d 1226, 1232 (8th Cir.), cert. denied, 519 U.S. 968 (1996).

Moreover, the contention is without merit for another reason. The jury was instructed that the felony underlying the charge of capital murder by Williams was kidnapping, not robbery. See Ark. Code Ann. § 5-10-101(a)(1)(iii). Consistent with the statutory definition of kidnapping, the jury was instructed that it had to find Williams "restrained Stacy Errickson with the purpose of inflicting physical injury upon her or engaging in sexual intercourse or sexual contact, or of committing aggravated robbery or any flight thereafter." See Ark. Code Ann. § 5-11-102(a)(3)-(5). After convicting Williams of capital murder, the jury found in the penalty phase that he committed the murder for pecuniary gain, consistent with § 5-4-604(6). There was no duplication, of constitutional dimension or otherwise.

**C. The "Especially Cruel or Depraved" Aggravator.** The jury unanimously found as an aggravating circumstance that capital murder was committed "in an especially cruel or depraved manner." Ark. Code Ann. § 5-4-604(8)(A). Williams attacks this finding in two ways. First, he argues that it was not supported by constitutionally sufficient evidence. Consistent with Ark. Code Ann. § 5-4-604(8)(B), the jury was instructed:

-30-

[A] capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted.

On direct appeal, the Supreme Court of Arkansas concluded that the evidence supported the jury's finding of this aggravating circumstance:

The State's evidence reflected Williams forcibly abducted Stacy Erri[c]kson, robbed her, raped her, and killed her. It further showed Erri[c]kson had a significant period of time to contemplate her fate. The physical evidence established a violent physical assault by appellant against the victim. Injuries to her head indicated deep bruising to her neck and to her face. The victim was bound with her hands behind her back. The medical testimony further indicated her death was by asphyxiation from strangulation.

Williams I, 991 S.W.2d at 571. Even before AEDPA (and Williams cites no later cases), the scope of our review of this issue was "extremely limited" -- applying the standard adopted in Jackson v. Virginia, 443 U.S. 307, 319 (1979), we determine whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. See Lewis v. Jeffers, 497 U.S. 764, 780-84 (1990); Skillicorn v. Luebbers, 475 F.3d 965, 977 (8th Cir.), cert. denied, 128 S. Ct. 297 (2007).

Williams argues that the evidence did not establish his *intent* to inflict mental anguish, serious physical abuse, or torture because there was no eyewitness to the murder or to his mental state after the murder, and his custodial statement did not reveal the requisite intent.[11] But the issue is whether a rational jury could find the requisite intent from circumstantial evidence in the record. "[A] federal habeas corpus

[11]We reject summarily Williams's convoluted contention that the prosecutor's closing argument somehow conceded failure to prove all but "mental anguish."

-31-

court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. The Supreme Court of Arkansas' determination was not an unreasonable application of Jeffers and Jackson.

Second, Williams contends that this statutory aggravating circumstance is unconstitutionally vague and overbroad. This contention is foreclosed by our recent decision in Johnson v. Norris, 537 F.3d 840, 849-50 (8th Cir. 2008), cert denied, 129 S. Ct. 1334 (2009).

## X. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. The petition for a writ of habeas corpus is denied in its entirety.

_____